**DON LOUETTE and JOHN R. STOFER, JR., v. STATE OF FLORIDA**

12 So. (2nd) 168                            January Term, 1943
March 5, 1943                                        Division B

*Whitaker Brothers* and *R. G. Tittsworth,* for appellants.

*J. Tom Watson,* Attorney General, and *Woodrow M. Melvin,* Assistant Atorney General, for appellant.

BROWN, J.:

An information was filed in the trial court against Don Louette, John Stofer, Jr., and Charlie William Pittman, alias "Biscuit," charging the three defendants in the first count with breaking and entering a certain store-house located in the fairgrounds in the City of Tampa, the property of the Beckwith-Holmes Company, a corporation, with the intent to steal goods and property of the value of more than fifty dollars. The second count charged them with the larceny, on May 22, 1942, of four automobile wheels, tires, and tubes, of the value of $160.00, the property of said corporation. The third count charged Louette and Stofer with unlawfully buying, receiving and aiding in the concealment of stolen property, on the same date and the description of the property being the same as in the second count.

Another information was filed at the same time against Louette and Pittman, the three counts of which were similar to the first, except that Stofer's name was omitted and the property was described as eight automobile tires and wheels and the date of the alleged crimes was stated to be May 25, 1942.

Defendant Pittman plead guilty to entering without breaking to commit grand larceny as charged under the first counts of each information, and to grand larceny as charged in the second count of each information.

The county solicitor abandoned the first two counts of the information insofar as defendants Louette and Stofer were concerned, and elected to go to trial against them on the third counts of the two informations, which charged them with buying and receiving property knowing it to have been stolen. By agreement the two cases were consolidated and tried together. Both defendants were found guilty by the jury, and from the judgments of conviction entered by the court the defendants appealed. These two appeals were submitted here on one transcript and argued together.

Employees of the Beckwith-Holmes Company testified that they discovered that, in all, 28 wheels, together with their tires and tubes, had been taken off of new automobiles which had been stored and jacked up in said storeroom, which storeroom was used by said corporation for the storage of some 52 new Packard and Hudson cars until the government would permit their sale.

This was reported to the police department, and officer Fisher was sent to investigate. He testified as to his investigation and the subsequent arrest of Pittman, and Louette and Stofer; that he first saw Louette in a room in the City jail after his arrest and there talked to him. Counsel for the State then asked officer Fisher if he asked Louette "about some tires," and he answered, "Yes, sir." Then the prosecuting attorney asked him: "Please state what he said with reference to tires and wheels at that time—whether or not he bought any?"

Counsel for defendant Louette objected to this question on the ground that the testimony of the witness had shown that Louette had been arrested and was in custody at the time, and no proper predicate had been laid or foundation established for the admission in evidence of any statement that might have been made at that time as evidence against the defendant on this trial. The jury was sent out and the assistant county solicitor stated to the court that he did not intend to introduce any evidence of any confession; that no confession had been given; that the testimony to be adduced was in the nature of an admission. The court then overruled the objection upon the ground that what the State expected to prove is considered only as an admission and not as a confession. After the jury was recalled counsel for the State asked this question: "Mr. Fisher, I believe the last question was where did you see Don Louette the first time after talking with Biscuit?" To which the witness answered: "At the police station." Question: "All right: tell us what happened from the time you saw him there, where he went, what took place." Whereupon, counsel for Louette renewed the same objection already made, which was overruled. Officer Fisher then answered that he and his partner Mr.

Keen took Mr. Louette in their car, and explained to him that these tires had been stolen and "we told him that we had information that some of these tires were in his possession and Louette said that he had eight tires, tubes and wheels." Then the officer asked him if he would mind taking them out there and showing them to them; that Louette said "No, not at all," he would "be glad to take us out and show them to us." That he said further: "If there is anything wrong with them, this negro Biscuit, I bought them from him and he told me they were all right." Whereupon they drove out to Louette's place in Lutz and there Louette showed them eight tires, tubes and wheels. That he, Fisher, took the numbers of the tires, made a record of them, gave Louette a receipt and took them as evidence. Then they took Louette back to the police station and put the tires in the property room. Over defendant's objections the officer was permitted to testify further, in answer to the question: "Did you have any conversation about any other tires at his place?" That he told Louette that there were 28 of these tires, tubes and wheels missing and 8 of them had been recovered, and that he, the officer, then asked Louette if he knew anything about any other of these tires, and he said: "No," that that was all he knew anything about. That on the way back to the station Louette said: "If there is anything wrong with those tires, I bought them from a negro named Biscuit and John Stofer brought him to me." And in answer to a further question he told who John Stofer was and where he lived. The court instructed the jury that this statement as to Stofer could not be considered about defendant Stofer, he not being present when the statement was made. That he, the officer, then went to see Stofer and Stofer said he knew nothing about the tires and that he had none in his possession except some old ones that were no good and insisted on his place being searched and no tires were found except the old ones referred to. That on the way to the station he asked Stofer if he knew the negro Biscuit and he replied he did. That after arriving at the station he and officer Keen took Stofer to their room and explained to him "just exactly what the situation was;" "that these tires had been stolen; that we had

recovered 8 of them from Mr. Louette and Mr. Louette had told us if there was anything wrong with those tires that Mr. Stofer had been the one that brought the negro to him in order to make the sale, and I told him also that this negro Biscuit had said that he had been with him; that he had gone with him when he went to get the tires at the warehouse and I asked him if that was true and he said 'no'." At the request of Louette's counsel the court instructed the jury not to consider this statement against the defendant Louette.

Then officer Fisher continued that they brought Mr. Louette into the room with Mr. Stofer and asked Louette to tell in front of Stofer what he had told them about the tires and Louette said that he had bought these tires from Biscuit after Mr. Stofer had sent the negro to him to sell the tires. They then asked Stofer if that was right and he said "no." That they then brought the negro Biscuit into the room and asked him to tell the story that he had told them and that Biscuit said that he had gone to Mr. Stofer's house to sell him these tires and told him he knew where he could get some new tires; that Stofer told him he did not have the money to buy them but he knew who would buy them and that Stofer took him in his car to the police station where he and Stofer met Louette, and that the three of them got into Mr. Louette's car and went out to the fairgrounds, and parked the car near the north door of the Art Exhibit building, (the building used by the Beckwith-Holmes Co., as a store room) while Louette and Stofer sat in the car he, Biscuit, went into the building and got four tires and brought them out and put them in the car and drove off.

At this point counsel for the defendant renewed his same objection, and said that he presumed the court was applying the same objection to this testimony all the way through, to-wit: that "no proper predicate has been laid." The court overruled the objection.

"Biscuit" further said they drove to Cass Street and North Boulevard and that Mr. Louette gave him at that time $20.00 and he got out and Stofer and Louette drove on off. That two or three days later he went to the Sanitary Department, where Louette was employed, and met Mr. Louette in

the afternoon and told him that he had some more tires to sell; that Mr. Louette told him to meet him that night at 9:30 at Cass Street and North Boulevard, which witness did, and he and Louette went back to the same building and witness went inside again and got 8 tires, tubes and wheels and put them in the car. That he wasn't exactly sure about the money given him at that time but that he got about $70.00 in all for all 12 tires.

At this point counsel for State asked the witness, Fisher, "Now, what, if anything, did Don Louette say after hearing the negro make that statement." To this question counsel for Louette objected upon the same ground above mentioned, which objection was overruled.

The witness answered that Louette admitted that he had gone with the negro, in his car, with Mr. Stofer, to this building, but the negro had told him that the tires were tires which he had got from the Royal American Shows and he thought that the tires were all right, and that he and Mr. Stofer sat in the car while the negro went in the warehouse and brought them back out. That the only thing Louette denied of the story that Biscuit told was that the second time they went back he said that they got only 4 tires whereas the negro said that they got eight. And the witness added: "That was the only discrepancy in the story that Louette told and the negro told, after they finally got together—after we got them all together and made them tell the story in front of each other." Whereupon counsel for defendant Louette moved to strike all the testimony of the witness Fisher as far as the defendant Louette was concerned because it affirmatively appeared that the same was inadmissible, the witness having testified that when they all got together they "made" them tell the story that was told. This objection was overruled.

The witness continued that after Biscuit had told his story and Louette had told his story, he, the witness, asked Stofer; "What about it?" And he said: "I am not the kind of guy that raps on his friends."

The witness further testified that the next day they recovered possession of 4 more tires from a man named Mat

Brown, that he brought Louette into the presence of Mr. Brown. Counsel for the State asked the witness to tell the jury what happened there in the presence of Mr. Brown, what witness said and what Louette said. This question was objected to by counsel for Louette upon the same ground which had been interposed before, to the effect that Louette was under arrest and in custody and no foundation for the introduction of a statement against his interests had been introduced, which question was overruled. The witness testified that he brought Louette in the presence of Brown and explained to him that they had recovered these tires from Brown at his house and that Brown said that he had bought them from Mr. Louette, 4 tires, tubes and wheels, all mounted, whereupon witness said to Louette: "How about it, did you sell them to Mr. Brown?" To which Louette replied: "I am not talking."

Witness also testified that the day before Stofer had told him that he had gone over to the warehouse on the one occasion with Louette and Biscuit, but he had nothing to do with taking the tires; that he did not make any money out of it or get any money out of it. The tires, tubes and wheels that had been testified about were later identified by employees of the Beckwith-Holmes Company, who said their value was $40.99 each, and were offered and admitted in evidence.

Before cross examining the witness, Fisher, counsel for defendants moved the court to strike all the testimony given by the witness as to statements made against the interests of the defendants Louette and Stofer upon the grounds heretofore stated. The motion was denied.

The question arises whether the trial judge erred in admitting the testimony of officer Fisher as to incriminating admissions made by the defendants without first, in the absence of the jury, inquiring into the circumstances under which the admissions were made and determining whether or not they were freely and voluntarily made; that is, whether they were obtained by any threats, inducements, promises or other improper influences. It is true that the testimony of the officer did not disclose any improper methods had been resorted to to get these defendants to make

the incriminating admissions testified to by the officer, nor does it appear that such improper influences were *not* brought to bear.

The rule as to the admissibility of confessions is well settled and, generally speaking, well understood, but there seems to be some conflict in the decisions of most of the states as to what should be made to appear before testimony as to incriminating admissions should be admitted in evidence.

A judicial confession, of course, is one that is made in court in the due course of legal proceedings. Extra-judicial confessions are those that are made out of court. The term "confession," in its legal sense, is restricted to an acknowledgment of guilt, made by a person after an offense has been committed, and it does not apply to a statement or declaration of an independent fact from which such guilt may be inferred. But confessions, whether made in or out of court, in order to be legally efficacious and admissible against a defendant, must be freely and voluntarily made.

We are not dealing with statements of the accused which constitute a part of the *res gestae;* nor are we dealing with statements in regard to mere collateral matters which are not incriminating in their nature.

The term "confessions" has been held by some courts to embrace not only an express declaration of the accused that he is guilty of the crime charged, but also those admissions of fact on his part from which guilt may be inferred. See 1 R.C.L., 550 et seq. However, the better rule, and the majority rule (1 R.C.L., 551; 22 C.J.S., 1420-22), is that the term "confession" does not apply to a mere admission or declaration of an independent fact which tends to prove guilt or from which guilt may be inferred, and our decisions show that this distinction between confessions and inculpatory admissions had been generally accepted and followed by this Court.

But when an admission of an incriminating fact or facts, from which guilt may be inferred, is sought to be introduced in evidence, the rules governing the admissibility thereof are quite similar to the rules governing the admissibility of a

confession. It is quite generally held that where it appears that force or threats or inducements were actually used in obtaining an admission from the accused, such admission is not admissible in evidence against him.

But there are some jurisdictions which hold that a preliminary showing to the court that no force, threats or inducements were resorted to and that the statement was voluntary, is not necessary. See 22 C.J.S. 1250 et seq. However, in the few cases in which this identical question has been discussed and decided in this jurisdiction, we have held that the voluntary character of the admission must be shown before it can be admitted in evidence. Thus in the case of Synes v. State, 78 Fla. 167, 82 So. 778, this Court said: "The rule is settled in this State that where admissions of an incriminating fact are made by the accused to an officer while the accused is in custody charged with crime, such admissions or confessions although extra-judicial, must appear to have been voluntarily made before admissible in evidence against him." And again in Bates v. State, 78 Fla. 672, 84 So. 373, this Court said:

"The rule seems to be well settled in this and other jurisdictions that before admissions made by a party while under arrest, can be introduced in evidence, the court should determine the principal question of whether the admissions were free and voluntary. Green v. State, 40 Fla. 474, 24 So. Rep. 537; Murray v. State, 25 Fla. 528, 6 So. Rep. 498; Coffee v. State, 25 Fla. 501, 6 So. Rep. 493; People v. Loper, 159 Cal. 6, 112 Pac. Rep. 720, Ann. Cas. 1912-B, 1193; Sykes v. State, 78 Fla. 167, 82 So. Rep. 778. . . . Whether admissions or confessions are freely and voluntarily made, is a question for the court and the duty is imposed upon it to determine this question before permitting it to go to the jury. The introduction of this testimony was objected to by defendant and sufficient grounds were stated to call this to the court's attention. The duty then devolved upon the court to make the investigation. . . . The question of whether an admission is freely and voluntarily made, is for the court to determine, and it is not a matter of the opinion of the witness. The proper method is to have the witness state the circum-

stances under which they were made so that the court and not the witness may determine if they were free and voluntary. This investigation should be made in the absence of the jury."

To like effect see also Harrison v. State, 110 Fla. 420, 148 So. 882.

But where it clearly appears that the admission was voluntarily made, it is admissible. Roberts v. State, 94 Fla. 149, 113 So. 726.

In this connection we might call attention to the fact that this Court has also held that incriminating statements of an accused while under arrest and in the custody of an officer are nevertheless admissible if it is shown that such statements were freely and voluntarily made, even though the officer did not warn the accused that what he might say could be used against him. Phillips v. State, 88 Fla. 117, 101 So. 204. Kearson v. State, 123 Fla. 324, 166 So. 832; McDonald v. State, 70 Fla. 250, 70 So. 24.

The case of Stoutamire v. State, 133 Fla. 757, 183 So. 316, dealt with the admissibility of a confession which was allowed to be introduced after the court had determined that it was freely and voluntarily made to the officers. In that case it was held that a confession voluntarily made was not inadmissible merely because the defendant was not advised by the officers of his constitutional rights and that anything that he said might be used against him at the trial. However, in that case the court had first determined that the confession was freely and voluntarily made before it was admitted.

In other words, the rule seems to be that an incriminating admission is admissible, whether made to a private citizen or to an officer, if it is affirmatively shown to have been free and voluntarily, although in the latter case, when made to an officer while in custody, the question of voluntariness *vel non* should be more stringently examined into and slighter evidence of threats or inducements may suffice to exclude it.

Our conclusion therefore is that in this case the court erred in admitting the testimony of officer Fisher as to the highly incriminating admissions made by the defendants, while under arrest and in custody, without first inquiring into

the circumstances under which they were made and determining the question as to whether or not they were freely and voluntarily made, uninfluenced by the use of any force, intimidation, coercion or threats, or the holding out of any inducements to them.

But counsel for the State earnestly contend that the testimony brought out by counsel for the defendants during the cross examination of witness Fisher either waived or cured any error that the court might have made in admitting such testimony in the first instance, and also rendered the error harmless. We cannot agree with this contention. It is true that on cross examination counsel for defendants brought out some additional parts of the statements made by the defendants to the witness, about which he had testified, but which were not contained in his testimony. These additional statements tended to show the reason why defendants thought that the negro Biscuit had lawfully come into possession of these tires and wheels, and therefore had a right to sell them. Witness Fisher admitted that some of these explanatory statements were made at the time and formed a part of the conversations he had testified about. Standing alone, the testimony brought out on cross examination does tend to create the impression that all statements made by the defendants to witness Fisher were voluntarily made, but the cross-examiner did not at any time go into the matter as to whether any threats, intimidations or inducements were resorted to by the officer to secure the admissions which he had testified to on direct examination. If counsel for defendants had not objected to the introduction in evidence of the admissions testified to by the officer at the time they were offered, there might be more force in the argument of counsel for the State.

It is well settled that when the State offers in evidence a part of a confession or an admission against interest, the defendant is entitled to bring out on cross-examination the entire conversation or admission, part of which had been introduced by the State. See 22 C.J.S., 1439; Sullivan v. McMillan, 26 Fla. 543, 8 So. 450. It is a general rule that a party does not waive his previous objection to the admission of improper, illegal or incompetent evidence merely by cross-

examining the witness with relation to the objectionable matter, and this rule clearly applies where the cross examination is not extended beyond the scope of the evidence on direct examination. 64 C.J., 1292; 70 C.J. 618. Of course, there are cases where the cross-examination goes into matters entirely beyond the scope of the direct examination and in such cases the cross-examiner can legitimately be held to have made the witness his own witness as to such new matter. It is difficult to define definitely the limits of a cross-examination. This matter must rest largely within the discretion of the trial court. But as a general rule, in the interests of truth and justice, a fairly wide latitude should be permitted in the cross-examination of an adverse witness. Padgett v. State, 64 Fla. 389, 59 So. 946; Johnson v. Reynolds, 97 Fla. 591, 121 So. 793; 70 C.J. 619.

The defendants had nothing to do with the introduction over their objection of the admissions testified to by the State's witness, and to say that because defendant's counsel undertook to weaken or offset as far as they legitimately could the prejudicial effect of this impoperly admitted testimony or the theory upon which it was introduced, would not be justified. Generally speaking, the object of cross-examination is to weaken or disprove the case of one's adversary and to test the recollection, veracity of prejudice of the witness, or to expose the impossibility of his testimony. The cross-examiner is not bound by the testimony given by the witness on his direct examination. 70 C.J. 618. And a party certainly does not waive his previous objection to the admission of improper evidence merely by cross-examining the witness with relation to the objectionable matter. See 64 C.J. 1292 and 70 C.J. 619 et seq.

The other assignments of error and questions raised by counsel for the defendants have been duly considered, but no prejudicial or reversible error is clearly made to appear therefrom. It is true that there is a slightly ambiguous or inaccurate clause in one paragraph of the Court's charge, a short *lapsus linguae,* but considering the entire paragraph, and the charge as a whole, we feel sure that the jury was not misled as to the rule of law upon which the Court was charg-

ing them. . Indeed, except for this one short clause, the charge of the court is clear and comprehensive and states the law of the case with judicial fairness both to the State and to the defendants.

However, because of the error above pointed out, with reference to the admission in evidence by the court of the inculpatory admissions against interest, an error which was harmful in its nature, both of the judgments of conviction now before us must be reversed and the cause remanded.

Reversed and remanded.

BUFORD, C. J., THOMAS and SEBRING, JJ., concur.